**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| ADESSA CONSULTING, INC., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>RUSSELL CELLULAR, INC., and VERIZON COMMUNICATIONS INC.,<br><br>Defendants. | **Case No. ______________________**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Adessa Consulting, Inc. ("Plaintiff") brings this Class Action Complaint against Defendants Russell Cellular, Inc. ("Russell") and Verizon Communications Inc. ("Verizon") (collectively "Defendants") individually and on behalf of all others similarly situated, and alleges, upon personal knowledge as to its own actions and its counsel's investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This class action arises out of a data breach (the "Data Breach") of the computer systems of Defendant Russell Cellular, Inc. ("Russell Cellular"), a Verizon Authorized Retailer, in which an unauthorized third party accessed certain private customer information ("Private Information" or "PII") and has sought to sell it on the dark web. This was confirmed through notice provided by Verizon based on information supplied by Russell Cellular, and reports that the third party has offered such private information for sale on the dark web.

2. Russell Cellular operates hundreds of retail locations nationwide under the Verizon brand and collects, stores, and transmits sensitive customer information in connection

with Verizon wireless services. Upon information and belief, the Data Breach exposed the personal and account information of over 6 million  Russell Cellular customers, including Plaintiff. The compromised data includes, inter alia, customer names, phone numbers, device identifiers (including IMEI numbers), and wireless plan information.

3. Public reporting and cybersecurity sources indicate that, beginning in or around March 2026, threat actors advertised a dataset of private and sensitive customer information associated with Russell Cellular for sale on dark web forums. The threat actors claimed that the dataset contains information relating to millions of individuals, including customers of Russell Cellular. These reports were later corroborated, in part, by Defendants' notice confirming that an unauthorized third party accessed certain customer information.

4. On or about March 17, 2026, Russell Cellular informed Verizon that an unauthorized third party accessed certain Russell Cellular customer information on its data bases. Verizon subsequently notified customers that the information accessed included customer names, phone numbers, the name of the customer's wireless plan, and a device identifier known as an IMEI. Verizon further stated that the incident did not impact Verizon systems and did not involve Verizon customers.

5. Upon information and belief, customers are required to entrust Defendants with sensitive, non-public Private Information as a condition of receiving goods and/or services, without which Defendants could not perform their regular business activities. Defendants retain this information for extended periods of time, including after the customer relationship has ended.

6. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties to protect and safeguard that information from unauthorized access and intrusion.

7. Defendants failed to adequately protect Plaintiff's and Class Members' Private

Information. This Private Information was accessed by an unauthorized third party due to Defendants' negligent and/or careless acts and omissions, including a failure to implement reasonable data security measures.

8. The exposed information—including customer names, phone numbers, and device identifiers—is particularly sensitive in the telecommunications context. This information can be used to facilitate SIM-swapping and port-out attacks, unauthorized account access, and targeted phishing schemes designed to exploit wireless account credentials.

9. In a SIM-swapping attack, a bad actor fraudulently transfers a victim's phone number to a device under the attacker's control. Once successful, the attacker can intercept calls and text messages, including one-time passcodes used for multi-factor authentication, enabling access to email, financial accounts, and other sensitive systems.

10. As a result of the Data Breach, Plaintiff and Class Members face a present and continuing risk of unauthorized account access, SIM-swapping attacks, phishing schemes, and other forms of fraud and misuse of their Private Information.

11. Defendants failed to provide timely and transparent notice of the Data Breach, and only disclosed the incident after Plaintiff's and Class Members' information had already been accessed by an unauthorized third party.

12. Plaintiff brings this action on behalf of all persons whose Private Information was accessed and exposed as a result of Defendants' failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) implement reasonable data security measures; and (iii) timely notify affected individuals of the Data Breach.

13. Defendants disregarded the rights of Plaintiff and Class Members by failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent

unauthorized access, and failing to follow appropriate data security protocols.

14. Plaintiff and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) unauthorized access to their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) increased risk of unauthorized account access, SIM-swapping, and phishing attacks; (vii) actual misuse of the compromised data, including increased spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and increased risk to their Private Information.

15. For business entities such as Plaintiff, the Data Breach presents additional risks, including disruption of business operations, unauthorized account changes, interception of communications, and potential exposure of confidential information transmitted through wireless services.

16. Plaintiff seeks to remedy these harms and prevent future data compromise on behalf of itself and all similarly situated persons whose Private Information was accessed and exposed as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## PARTIES

17. Plaintiff Adessa Consulting, Inc. ("Plaintiff" or "Adessa") is a corporation organized under the laws of the State of New York with its principal place of business in New York, New York. Plaintiff is, and at all relevant times was, a customer of Russell Cellular and/or Verizon, and provided sensitive personal, business and account information in connection with wireless services.

18. Defendant Russell Cellular is a Missouri corporation with its principal place of business in Battlefield, Missouri. Russell Cellular is an authorized retailer of Verizon wireless products and services and operates numerous retail locations nationwide, including within New York.

19. Defendant Verizon is a Delaware corporation with its principal place of business in New York, New York. Verizon provides telecommunications services nationwide and authorizes, oversees, and benefits from the operations of its authorized retailers, including Russell Cellular.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the proposed Class, and at least one member of the Class is a citizen of a state different from at least one Defendants. Plaintiff Adessa is a citizen of New York, Defendant Russell Cellular, the primary defendant, is a citizen of Missouri, and Defendant Verizon is a citizen of Delaware and New York.

21. This Court has personal jurisdiction over Defendant Russell because it maintains its principal place of business in this District and conducts substantial business herein.

22. This Court has personal jurisdiction over Defendant Verizon because it conducts substantial business in this District, and purposefully avails itself of the privilege of conducting activities here.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and Defendant Russell maintains its principal place of business in this District.

## FACTUAL ALLEGATIONS

***Background of Defendants***

24. Defendant Russell Cellular is one of the largest authorized retailers of Verizon wireless products and services in the United States. Russell Cellular operates hundreds of retail locations nationwide under the Verizon brand and collects, stores, and transmits sensitive customer information in connection with the provision of wireless services.

25. Defendants Verizon is a telecommunications company headquartered in New York that provides wireless services nationwide and authorizes, oversees, and benefits from the operations of its authorized retailers, including Russell Cellular.

26. Plaintiff and Class Members are current and former customers of Defendant Russell who obtained wireless products and/or services through Russell Cellular operating under the Verizon brand.

27. In order to obtain wireless services, devices, and account access, Plaintiff and Class Members were required to provide Defendants with sensitive and confidential information, including, but not limited to, names, phone numbers, email addresses, account information, and device identifiers (including IMEI and ESN numbers) or  Private Information.

28. Upon information and belief, the information maintained by Defendants in their computer systems at the time of the Data Breach included the unencrypted and/or inadequately protected Private Information of Plaintiff and Class Members.

29. Defendants made express and implied promises to Plaintiff and Class Members that the Private Information collected in connection with wireless services would be kept secure, confidential, and protected from unauthorized access. These promises were conveyed through privacy policies, terms of service, and the overall nature of Defendants' business practices.

30. Plaintiff and Class Members provided their Private Information with the reasonable expectation and mutual understanding that Defendants would adequately safeguard such information and comply with their obligations to maintain its confidentiality.

31. Plaintiff and Class Members took reasonable steps to maintain the confidentiality

of their Private Information and relied on Defendants to implement appropriate administrative, technical, and physical safeguards to protect that information.

32. Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding their Private Information and to prevent its unauthorized disclosure.

33. Defendants' duties arose from, inter alia, their roles as custodians of sensitive consumer data, applicable industry standards, contractual obligations, representations made to Plaintiff and Class Members, and obligations under federal and state law, including the Federal Trade Commission Act.

34. Defendants derived substantial economic benefit from collecting, storing, and using Plaintiff's and Class Members' Private Information, including by facilitating wireless service accounts, device activations, and related transactions.

35. By collecting and maintaining Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties to protect that information and knew or should have known that failure to do so would result in significant harm to Plaintiff and Class Members.

***The Data Breach***

36. In or around March 2026, cybersecurity researchers, threat intelligence firms, and media outlets began reporting that a dataset purportedly associated with Russell Cellular was being offered for sale on dark web marketplaces. For example, one report noted that a "database allegedly belonging to Russell Cellular is now circulating on a well-known hacker forum" and being offered for sale by threat actors. Other reporting similarly described "a dataset allegedly containing more than 6.3 million customer records …is there being offered for sale online for $1,200."[1] These reports were later corroborated, in part, by Defendant Verizons' notice confirming that an unauthorized

[1] Teiss, *Hackers Claim 6.3 Million Customer Records Stolen from Verizon Retail Partner Russell Cellular* (Mar. 2026), https://www.teiss.co.uk/news/hackers-claim-63-million-customer-records-stolen-from-verizon-retail-partner-russell-cellular-17247

third party accessed certain customer information.

37. On or about March 17, 2026, threat actors publicly advertised a database for sale on criminal forums, claiming that the dataset had been extracted from systems associated with Russell Cellular and contained sensitive customer and account information.[2]

38. The threat actors represented that the dataset consists of tens of gigabytes of data and includes records relating to approximately 6.3 million individuals.[3] These representations, while originating from cybercriminal sources, have been widely reported and analyzed by independent cybersecurity researchers.

39. According to public reporting, the dataset includes detailed customer information such as names, phone numbers, email addresses, account information, and device identifiers, including IMEI and ESN numbers—data that is uniquely sensitive in the telecommunications context because it can be used to facilitate account takeover, SIM-swapping attacks, and other forms of targeted fraud.[4]

40. Security researchers have reported that samples of the dataset have been reviewed and appear to contain detailed customer account information, lending credibility to the claim that the data is authentic and originated from a centralized customer database. [5]

41. The size, scope, and structure of the dataset—as described in public reporting—indicate that it is unlikely to have been assembled from disparate or publicly available sources, and instead strongly suggest that it originated from a non-public database associated with Russell

---

[2] BrinzTech, *Breach Alert: 6.3 Million Customer Records of Russell Cellular on Sale* (Mar. 2026), https://www.brinztech.com/breach-alerts/brinztech-alert-6-3-million-customer-records-of-russell-cellular-on-sale/

[3] *Id.*

[4] See, e.g., Android Police, *6.3 Million Verizon Customers Might Have Had Their Data Exposed* (Mar. 2026), https://www.androidpolice.com/63-million-verizon-customers-might-have-had-their-data-exposed/.

[5] See, e.g., Cybernews, *Verizon Retailer Data Breached, Hackers Claim* (Mar. 2026), https://cybernews.com/security/russell-cellular-data-data-breach/; Android Police, *6.3 Million Verizon Customers Might Have Had Their Data Exposed* (Mar. 2026), https://www.androidpolice.com/63-million-verizon-customers-might-have-had-their-data-exposed/

Cellular or systems used in connection with Verizon wireless services.

42. On or about March 17, 2026, Russell Cellular informed Verizon that an unauthorized third party accessed certain customer information. Verizon subsequently notified customers that the information accessed included customer names, phone numbers, the name of the customer's wireless plan, and a device identifier known as an IMEI.

43. The public offering of such a dataset on criminal marketplaces significantly elevates the risk to affected entities or individuals, as cybercriminals routinely purchase and exploit such data for phishing schemes, account takeovers, and SIM-swapping attacks, particularly where phone numbers and device identifiers are involved.

44. Russell Cellular has not publicly issued direct notice to affected entities or individuals or publicly disclosed the full scope of the incident, including the total number of individuals affected or the complete categories of data involved.

45. Russell Cellular has also not disclosed critical facts necessary for affected entities or individuals to assess their risk, including, inter alia: (a) when any unauthorized access began; (b) how long any unauthorized access persisted; (c) the full scope of affected entities or individuals; and (d) the specific security failures that permitted the unauthorized access.

46. Verizon has acknowledged the incident, stating that it is aware of a "potential threat targeting customer data" involving a third-party retailer and that it is investigating the matter.[6]

47. Verizon has acknowledged the incident and notified customers that it is "aware of a data security incident experienced by Russell Cellular" and that "an unauthorized third party accessed certain customer information."

48. Verizon further stated that it has "no evidence that this data has been used" and that the incident "did not impact Verizon systems," while confirming that it initiated an investigation

---

[6] Cybernews, *Russell Cellular Data Breach? Verizon Says It's Investigating* (Mar. 2026), https://cybernews.com/security/russell-cellular-data-data-breach/

after being notified by Russell Cellular. Verizon further confirmed that the Data Breach affected only Russell Cellular customers, and did not impact Verizon customers.

49. The existence of a detailed dataset being offered for sale on dark web marketplaces, combined with Defendant Verizon's notice confirming unauthorized access to Russell Cellular's customer information, constitutes strong evidence that Plaintiff's and Class Members' Private Information was accessed and exposed to unauthorized third parties.

50. Defendants failed to provide timely and transparent notice, and only disclosed the incident after Plaintiff's and Class Members' information had already been accessed by an unauthorized third party.

51. Upon information and belief, the dataset remains available on criminal marketplaces and/or has been disseminated to unknown third parties, creating a present and ongoing risk of misuse of Plaintiff's and Class Members' Private Information.

52. As a direct and proximate result of the foregoing, Plaintiff and Class Members face a substantial and imminent risk of unauthorized account access, SIM-swapping attacks, phishing schemes, and other forms of telecom-related fraud and misuse.

***Data Breaches Are Preventable***

53. Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

54. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[4]

55. To prevent and detect cyber-attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, customers and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and

authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

[4] https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited January 29, 2026)

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units. [5]

56. The existence of the Data Breach, as reflected in the unauthorized exposure and dissemination of Private Information described herein, indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the exposure of the Private Information of, upon information and belief, millions of entities and individuals, including that of Plaintiff and Class Members.

***Defendants Acquires, Collects, and Stores Its Customers' Private Information***

57. As a condition of receiving goods and/or services, Plaintiff and Class Members were required to give their sensitive and confidential Private Information to Defendants.

---

[6] See https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited January 29, 2026)

58. Defendants retain and store this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiff's and Class Members' Private Information, Defendants would be unable to provide their services.

59. By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

60. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendants to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

61. Defendants could have prevented the unauthorized access to and exposure of Plaintiff's and Class Members' Private Information by properly securing and encrypting the files and systems containing such information.

***Defendants Knew or Should Have Known of the Risk Because Companies in Possession of Private Information are Particularly Susceptible to Cyber Attacks***

62. Data thieves regularly target companies like Defendants' due to the highly sensitive information that they custody. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

63. Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store Private Information and other sensitive information, like Defendants, preceding the events described herein.

64. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[7] The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78 percentage increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

65. In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendants knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

66. Additionally, as companies became more dependent on computer systems to run their business[8], e.g., working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[9]

67. As a custodian of Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class members, and of the foreseeable consequences if their data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

---

[7] See 2023 Data Breach Annual Report, (https://www.idtheficenter.org/wp-content/uploads/2024/01/ITRC 2023) last visited January 29, 2026)

[8] https://www.federalreserve.govieconres/notes/feds -notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited January 29, 2026).

[9] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last visited January 29, 2026).

68. Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from unauthorized access and exposure.

69. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

70. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' server(s), amounting to the significant number of persons and entities who could be harmed by the exposure of the unencrypted data.

71. Defendants have not provided timely notice or offered adequate monitory services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. Moreover, Plaintiff and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

72. Defendants' failure to provide timely notice establishes that Plaintiff and Class Members' sensitive Private Information was in fact affected, accessed, compromised, and exfiltrated from Defendants' computer systems.

73. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

74. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long-lasting and severe. Once Private Information is exposed—fraudulent use of that information and damage to victims may continue for years.

75. As a company in possession its current and former customers Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the unauthorized access to and exposure of Private Information.

***Value of Personally Identifying Information.***

76. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employee benefit management company or taxpayer identification number."[10]

77. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[11] For example, Personal Information can be sold at a price

[10] 17 C.F.R. § 248.201 (2013).
[11] *Id*

ranging from $40 to $200.[12] Criminals can also purchase access to entire company data breaches from $900 to $4,500.

78. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—name, address, and Social Security number.

79. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[13]

80. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

81. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies

[12] Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends, Oct. 16, 2019, available at: https ://www.digitaltrends com/computing/personal-data-s old-on-the -dark-web-how-much-it-costs/ (last visited January 29, 2026).

[13] Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited January 29, 2026).

that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[14]

82. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***Defendants Fails to Comply with FTC Guidelines.***

83. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

84. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal employee information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

85. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

86. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor

[14] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited January 29, 2026).

for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

87. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect employee data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential employee data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

88. These FTC enforcement actions include actions against companies like Defendants.

89. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

90. Defendants failed to properly implement basic data security practices.

91. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

92. Upon information and belief, Defendants was at all times fully aware of its obligation to protect the Private Information of its customers. Defendants was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information it

obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

***Defendants Fails to Comply with Industry Standards.***

93. As noted above, experts studying cyber security routinely identify companies in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

94. Several best practices have been identified that, at a minimum, should be implemented by companies in possession of Private Information, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

95. Other best cybersecurity practices that are standard in the media industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

96. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06,

DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

97. These foregoing frameworks are existing and applicable industry standards in the media industry safeguarding their customers' data, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***Common Injuries and Damages.***

98. As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

***The Data Breach Increases Victims' Risk of Identity Theft***

99. The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web as that is the modus operandi of hackers.

100. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

101. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

102. Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

103. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[15]

104. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an

[15] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. See, e.g., Brian Krebs, Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm, Krebs on Security (Sep. 18, 2014), https ://kreb sonsecuritv.eotn/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in- underground-stolen-from-texas-life-insurance-finn/ (last visited January 29, 2026).

astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

105. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

106. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiff and the other Class Members.

107. Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

108. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud.***

109. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports

could expose the individual to greater financial harm — yet the resource and asset of time has been lost.

110. Extensive suggestion of steps that Plaintiff and Class Members must take in order to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiff and Class Members must undertake in response to the Data Breach. Plaintiff's and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiff and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach.

111. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, freezing their payment cards, contacting credit bureaus to place freezes on their accounts, and monitoring their financial accounts for any indication of fraudulent activity, which may take years to detect. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

112. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.[16]

113. Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports

114. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.”

***Diminution of Value of Private Information.***

115. Private Information is a valuable property right.[17] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

116. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[18]

117. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.

---

[17] See "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited January 29, 2026) ("GAO Report").

[18] See, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3 -4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted). (last visited January 29, 2026).

Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[19]

118. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

119. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

120. The fraudulent activity resulting from the Data Breach may not come to light for years.

121. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

122. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to, upon information and belief, millions of customers' detailed personal information and, thus, the

[19] https://digi.me/what-is-digime/ (last visited January 29, 2026).

significant number of entities or individuals who would be harmed by the exposure of the unencrypted data.

123. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

***Future Costs of Credit and Identity Theft Monitoring is Reasonable and Necessary.***

124. Given the type of targeted attack, the sophisticated criminal activity, and the type of Private Information involved in this case, according to the bad actor here entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes —e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

125. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual and entity not know that their Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employee-benefit management company of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

126. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

127. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach.

***Loss of Benefit of the Bargain.***

128. Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to obtain goods and/or services from Defendants under certain terms, Plaintiff and other reasonable customers understood and expected that Defendants would properly safeguard and protect their Private Information, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

***Plaintiff Adessa Consulting's Experience***

129. Plaintiff is a customer of Defendant Russell Cellular.

130. Upon information and belief, as a condition of receiving goods and/or services, Plaintiff was required to provide their Private Information to Defendants.

131. Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff's Private Information in its system.

132. Plaintiff is very careful about sharing its sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

133. Plaintiff provided its Private Information to Defendants and trusted they would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law.

134. Plaintiff reasonably understood that in exchange for providing Defendants with its Private Information, Defendants would employ adequate cybersecurity measures and protect their Private Information.

135. As a result of the Data Breach, Plaintiff is making reasonable efforts to mitigate the impact of the Data Breach, including but not limited to monitoring its financial and business accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time on mitigation activities in response to the Data Breach.

136. Subsequent to the Data Breach, Plaintiff has suffered numerous, substantial injuries including, but not limited to: (i) invasion of privacy; (ii) theft of its Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

137. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

138. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

139. Plaintiff has a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## **CLASS ACTION ALLEGATIONS**

140. Plaintiff brings this nationwide class action on behalf of itself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil

Procedure.

141. The Class that Plaintiff seeks to represent is defined as follows:

Nationwide Class: All persons and entities residing in the United States whose Private Information was accessed and/or acquired by an unauthorized third party as a result of the Data Breach (the "Class").

142. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

143. Plaintiff reserves the right to amend the definitions of the Class or Subclass or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

144. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

145. Numerosity. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of entities or individuals are currently unknown to Plaintiff and exclusively in the possession of Defendants, upon information and belief, thousands to millions of individuals and entities were impacted. The Class is apparently identifiable within Defendants' records.

146. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a. Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendants had respective duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendants had respective duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e. Whether and when Defendants actually learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g. Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendants' wrongful conduct; and,

k. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

147. Typicality. Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

148. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the

Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

149. Adequacy. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered is typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

150. Superiority and Manageability. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

151. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to

exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

152. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

153. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

154. Unless a Class-wide injunction is issued, Defendants may continue in its failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

155. Further, Defendants has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

156. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants failed to timely notify the Plaintiff and the class of the Data Breach;

b. Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendants failed to take commercially reasonable steps to safeguard its clients' Private Information; and,

f. Whether adherence to widely accepted data security standards, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

### (On Behalf of Plaintiff and the Class)

157. Plaintiff re-alleges and incorporates by reference all of the allegations as if fully set forth herein.

158. Defendants require current and former customers, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of providing its services.

159. Defendants gathered and stored the Private Information of Plaintiff and Class Members as part of its business of soliciting its clients, which solicitations and services affect commerce.

160. Plaintiff and Class Members entrusted Defendants with their Private Information with the understanding that Defendants would safeguard their information.

161. Defendants had full knowledge of the sensitivity of the Private Information and

the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

162. By assuming the responsibility to collect and store this data, and in fact doing so, and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from unauthorized access.

163. Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

164. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

165. Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendants with their confidential Private Information, a necessary part of receiving goods and/or services.

166. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

167. Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or the Class.

168. Defendants also had a duty to exercise appropriate clearinghouse practices to remove former customers' Private Information it was no longer required to retain pursuant to regulations.

169. Moreover, Defendants had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

170. Defendants had and continue to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendants' possession was accessed by an unauthorized third party, how it was accessed, and precisely the types of data involved and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair unauthorized account access, SIM-swapping, and other misuse of their Private Information by third parties.

171. Defendants breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Allowing unauthorized access to Class Members' Private Information;

d. Failing to detect in a timely manner that Class Members' Private Information had been by an unauthorized third party;

e. Failing to remove former customers Private Information it was no longer required to retain pursuant to regulations, and;

f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the risk of unauthorized account access, SIM-swapping, and other damages.

172. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

173. Defendants' violation of Section 5 of the FTC Act constitutes negligence.

174. Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statute was intended to guard against.

175. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

176. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

177. It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting companies in possession of Private Information.

178. Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

179. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendants' systems.

180. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

181. Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendants' possession.

182. Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

183. Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

184. Defendants acknowledged that the Private Information of Plaintiff and the Class was accessed by an unauthorized third party as a result of the Data Breach.

185. But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been accessed and exposed to unauthorized third parties.

186. There is a close causal connection between Defendants' failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

187. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) unauthorized access their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) increased risk of unauthorized account access, SIM-swapping, and phishing attacks; (vii) actual misuse of the compromised data, including an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

188. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not

limited to, loss of privacy, and other economic and non-economic losses.

189. Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendants' possession and is subject to further unauthorized access so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

190. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

191. Defendants' negligent conduct is ongoing, in that they still hold the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

192. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

193. Plaintiff re-alleges and incorporates by reference all of the allegations as if fully set forth herein.

194. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice

by Defendants of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendants' duty.

195. Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Private Information and not complying with industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of unauthorized access on Defendants' systems.

196.Defendants' violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

197. Plaintiff and Class members are persons and entities within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

198. Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

199. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered or will suffer injury, including but not limited to: (i) invasion of privacy; (ii) unauthorized access to their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) increased risk of unauthorized account access, SIM-swapping, and phishing attacks; (vii) actual misuse of the compromised data, including an increase in spam calls, texts, and/or emails; (viii) nominal

damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains available for unauthorized third parties to access and misuse; and (b) remains in Defendants' possession and is subject to further unauthorized access so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

200. Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

201. Plaintiff re-alleges and incorporates by reference all of the allegations as if fully set forth herein.

202. Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they provided Defendants with their Private Information and paid for goods and/or services. In exchange, Plaintiff and Class Members reasonably expected that their Private Information would be protected with adequate data security.

203. Defendants knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendants profited from their business relationship with Plaintiff and Class Members and used Plaintiff's and Class Members' Private Information for business purposes.

204. Defendants failed to adequately secure Plaintiff's and Class Members' Private Information and, therefore, did not provide the full benefit of the bargain for which Plaintiff and Class Members paid.

205. Defendants retained the Private Information through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

206. If Plaintiff and Class Members had known that Defendants would not use adequate data security practices, procedures, and protocols to monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information to Defendants or obtained services from Defendants.

207. Plaintiff and Class Members have no adequate remedy at law.

208. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented unauthorized access to that information, Defendants failed to implement effective security measures and diverted those resources to their own benefit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide adequate data security.

209. Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

210. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) unauthorized access to their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) increased risk of unauthorized account access, SIM-swapping, and phishing attacks; (vii) actual misuse of the compromised data, including an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private

Information, which: (a) remains available for unauthorized third parties to access and misuse; and (b) remains in Defendants' possession and is subject to further unauthorized access so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

211. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

212. Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

213. Plaintiff re-alleges and incorporates by reference all of the allegations as if fully set forth herein.

214. Plaintiff and the Class entrusted their PII to Defendants as a condition of receiving services. In so doing, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data was accessed by an unauthorized third party.

215. At the time Defendants acquired the PII of Plaintiff and the Class, there was a meeting of the minds and a mutual understanding that Defendants would safeguard the PII and not take unreasonable risks when storing the PII.

216. Implicit in the agreements between Plaintiff and Class Members and Defendants to

provide PII was Defendants' obligation to: (a) use such PII for business purposes only; (b) take reasonable steps to safeguard that PII; (c) prevent unauthorized disclosures of the PII; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any unauthorized access to their PII; (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or use; and (f) retain the PII only under conditions that kept such information secure and confidential.

217. Plaintiff and the Class would not have entrusted their PII to Defendants had they known that Defendants would fail to implement adequate data security measures, including failing to properly secure sensitive data and retaining PII longer than reasonably necessary.

218. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendants.

219. Defendants breached the implied contracts they made with Plaintiff and the Class by failing to safeguard and protect their PII, by failing to appropriately retain and secure such information, and by failing to provide timely and accurate notice that Plaintiff's and Class Members' information was accessed by an unauthorized third party.

220. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer) a risk of unauthorized account access, SIM-swapping, phishing, and other misuse of their information; loss of the confidentiality of their Private Information; potential exposure of their information on criminal marketplaces; expenses and time spent monitoring and mitigating the consequences of the Data Breach; lost time and opportunity costs; and other economic and non-economic harm.

221. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages to be determined at trial.

## COUNT V
## VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT
**RSMo. § 407.010 *et seq*.**
**(On Behalf of Plaintiff and the Class)**

222. Plaintiff re-alleges and incorporates by reference all of the allegations as if fully set forth herein.

223. RSMo. § 407.020 prohibits the use of any "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."

224. An "unfair practice" is defined by Missouri law, 15 CSR 60-8.020, as any practice which: (A) Either—Offends any public policy as it has been established by the Constitution, statutes, or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; orIs unethical, oppressive, or unscrupulous; and (B) Presents a risk of, or causes, substantial injury to consumers.

225. Additionally, 15 CSR 60-8.040 provides that it is an unfair practice for any person, in connection with the advertisement or sale of merchandise, to violate the duty of good faith in solicitation, negotiation, or performance, or otherwise fail to act in good faith.

226. Plaintiff and Defendants are "persons" within the meaning of RSMo. § 407.010(5).

227. "Merchandise" is defined by the MMPA to include services, and therefore encompasses the wireless services, devices, and related data services offered by Defendants.

228. Plaintiff's and the Class's transactions with Defendants included the purchase of wireless services and related products in consumer-oriented transactions, and such transactions fall within the scope of "merchandise" and "trade or commerce" as defined by the MMPA.

229. As set forth herein, Defendants' acts, practices, and conduct violate RSMo. § 407.020 in that, among other things, Defendants have engaged in unfair practices and the concealment, suppression, and omission of material facts in connection with the advertising, marketing, and sale

of their services. Such acts offend public policy and constitute "unfair practices" within the meaning of the MMPA.

230. Defendants' unfair, unlawful, and deceptive acts, practices, and conduct include, but are not limited to: (1) representing, directly or indirectly, that they would safeguard customers' Private Information from unauthorized access; (2) failing to implement and maintain reasonable data security measures; (3) failing to adequately monitor and protect their systems; and (4) failing to timely disclose that customer information had been accessed by an unauthorized third party.

231. Defendants' conduct also violates the implementing regulations of the MMPA because it: (1) offends public policy; (2) is unethical, oppressive, and unscrupulous; (3) causes substantial injury to consumers; (4) reflects a failure to act in good faith; and (5) is otherwise unlawful. See Mo. Code Regs. tit. 15, § 60-8.

232. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and members of the Class have suffered ascertainable loss, including but not limited to: (1) paying for services with the expectation that their Private Information would be adequately protected; and (2) receiving services of diminished value due to Defendants' failure to provide adequate data security.

233. Plaintiff, on behalf of itself and the Class, seeks actual damages, statutory damages where available, attorneys' fees, and all other relief permitted under the MMPA.

## COUNT VI
## DECLARATORY JUDGMENT
## (On Behalf of Plaintiff and the Class)

224. Plaintiff re-alleges and incorporates by reference all of the allegations as if fully set forth herein.

225. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those

alleged herein, which are tortious and which violate the terms of the federal and state statutes described above.

226. An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendants' common law and other duties to act reasonably with respect to employing reasonable data security measures. Plaintiff alleges Defendants' actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the ongoing risk of unauthorized account access, fraud, and misuse of their information resulting from the Data Breach.

227. Under its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following: a. Defendants continue to owe a legal duty to employ reasonable data security measures to secure the Private Information they possess, and to notify impacted entities or individuals of the Data Breach under the common law and Section 5 of the FTC Act; b. Defendants continue to breach their duty by failing to employ reasonable measures to secure their customers' Private Information; and c. Defendants' breach of their legal duty continues to cause harm to Plaintiff and the Class.

228. The Court should also issue corresponding injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect Plaintiff's and Class Members' Private Information.

229. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another incident involving unauthorized access to Defendants' data systems. If such an incident occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable, and they would be forced to bring multiple lawsuits to address the same conduct. Monetary damages, while warranted to compensate Plaintiff and the Class for certain losses, do not fully remedy the ongoing risks and harms associated with Defendants' inadequate data security practices.

230. The hardship to Plaintiff and the Class if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued.

231. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by reducing the risk of future unauthorized access to sensitive information and preventing the injuries that would result to Plaintiff, the Class, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all Class Members, requests judgment against Defendants and that the Court grants the following:

A. For an order certifying the Class, as defined herein, and appointing Plaintiff and their Counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the unauthorized access to and exposure of the Private Information of Plaintiff and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. requiring Defendants to delete, destroy, and purge the personally identifiable information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the

retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v. requiring Defendants to engage independent third-party security auditors and penetration testers, as well as internal security personnel, to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and to promptly correct any problems or issues detected by such testing;

vi. requiring Defendants to engage independent third-party security auditors and internal personnel to implement and maintain automated security monitoring;

vii. requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

viii. requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, unauthorized actors cannot gain access to other portions of Defendants' systems;

ix. requiring Defendants to conduct regular database scanning and security checks;

x. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personally identifiable information;

xi. requiring Defendants to conduct internal training and education routinely and periodically to inform personnel how to identify and respond to a data security incident;

xii. requiring Defendants to implement a system of tests to assess employees' knowledge of the

education programs discussed above, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting Private Information;

xiii. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and to assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the unauthorized access to their Private Information, as well as the steps affected individuals may take to protect themselves;

xv. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance;

D. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees and costs as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury on all claims so triable.

Dated: April 10, 2026

By: /s/ Maureen M. Brady
Maureen M. Brady (MO#57800)
**McShane & Brady, LLC**
4006 Central Street
Kansas City, MO 64111
Tele: 816-888-8010
Fax: 816-332-6295
mbrady@mcshanebradylaw.com

Lynda Grant*
**The Grant Law Firm**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tele: 212-292-4441
Fax: 212-292-4442
*lgrant@grantfirm.com*

Melissa R. Emert*
**Kantrowitz Goldhamer**
**Graifman Perlmutter & Carballo P.C.**
135 Chestnut Ridge Road-Suite 200
Montvale, NJ 07645
Tele: 845-356-2570
Fax: 845-356-4335
memert@kgglaw.com

Amer J. Anwar
**j. Anwar & Associates**
321 Broadway-3rd Floor
New York, NY 10007
Tel: 848-468-0499
janwarlaw@gmail.com

*Counsel for Plaintiff and the proposed class*

**pro hac vice forthcoming*